UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DAWN WEIHER,

    Plaintiff,

v.                         Case No. 8:20-cv-2569-VMC-AEP

LINCARE PROCUREMENT, INC.,

    Defendant.
_____/

**ORDER**

    This matter comes before the Court upon consideration of Defendant Lincare Procurement, Inc.'s Motion for Summary Judgment (Doc. # 26), filed on August 16, 2021. Plaintiff Dawn Weiher responded on September 27, 2021 (Doc. # 30), and Defendant replied on October 11, 2021. (Doc. # 31). For the reasons that follow, the Motion is granted.

**I.**   **Background**

    In August 2018, Weiher began working for Lincare[1] in the Procurement Department as a Category Manager. (Doc. # 27-1 at 52:12-17; Doc. # 30-7 at 5:2-5). Weiher was hired by Doran Fanning, who was her direct supervisor throughout her

_____

[1] Lincare Inc. is a provider of oxygen and other respiratory therapy services to patients at home. (Doc. # 27-29 at ¶ 3). Defendant Lincare Procurement, Inc. is responsible for procurement and cost savings for Lincare Inc. (Id.).

employment at Lincare. (Doc. # 27-1 at 53, 55, 74; Doc. # 27-30 at ¶ 3). Weiher agreed to a 9:00 a.m. start time, although she had reservations about being able to meet that expectation. (Doc. # 27-1 at 65-67).

At the beginning of her employment, Weiher was responsible for helping to support the IT and "indirects" categories at Lincare. (Doc. # 27-1 at 68:13-16, 73:5-14). Weiher described the "indirects" portion of her job as a sort of catch-all: "everything from toilet paper to . . . maid service and uniforms for over 800 locations across the U.S." (Id. at 68:14-17). Weiher's duties included meeting and communicating with vendors, negotiating prices, and working with clients in an attempt to save money for Lincare. (Id. at 69:4-14). Responsiveness was important to Weiher's position because she was required to interact with vendors, IT leaders, and others to address contract renewals, bids, and other procurement-related issues. (Id. at 69:17-19; 164:23-165:7; Doc. # 27-30 at ¶ 3). Weiher received a favorable performance review for 2018. (Doc. # 30-7 at 12:4-13:3).

According to Lincare, Weiher's performance began to decline in March 2019. (Doc. # 27-30 at ¶ 4). Specifically, according to Fanning, she struggled with responsiveness, completing her assigned job duties, and delivering a

consistent work product. (Id.). Fanning stated that he addressed these issues informally with Weiher during their one-on-one meetings each month. (Id.). Weiher counters that there are no documents showing that her performance began to decline in March 2019. (Doc. # 30-7 at 14:1-25).

At some point in 2019,[2] Fanning assigned Weiher a project called the "IT Master," which was, as Weiher described it: "A very large list of all the contracts for services, hardware, [and] warranties." (Doc. # 27-1 at 167:10-11). Fanning explained that the IT Master was an important project because it enabled their department to keep track of all contract renewals needed for the IT department and it helped ensure that the IT system did not experience lapses in service. (Doc. # 27-30 at ¶¶ 4-5). Fanning testified that Weiher struggled with keeping the IT Master up to date. (Id. at ¶ 5). Weiher admitted that creating and maintaining the IT Master was "quite intensive" and "an undertaking that was impossible with my workload to get completed in a timely fashion." (Doc. # 27-1 at 167:23, 168:12-13).

_____

[2] According to Lincare, Weiher got the IT Master in March 2019 (Doc. # 27-30 at ¶ 5), but Weiher testified that it wasn't her responsibility until August 2019. (Doc. # 27-1 at 186:8-11).

From January to July 2019, Weiher was late to work a total of 117 times, and on most of those occasions she was more than 30 minutes late. (Doc. # 27-29 at ¶ 4). Weiher does not dispute that she was often late to work, and explained that "I am very slow to get started in the morning because I'm in pain. . . . It takes me a while to get going. And since I'm diabetic, I have to eat breakfast." (Doc. # 27-1 at 139-40). She testified that her arthritis and peripheral hyperhidrosis made it difficult for her to dry off after a shower and dry her hair. (Id. at 140:2-10).

As Weiher explained it, peripheral hyperhidrosis is a condition that causes her to sweat excessively. (Id. at 92:24-94:12). She takes medication to help control the symptoms of hyperhidrosis, and she agreed that the medication is effective. (Id. at 96:7-97:1).

In July 2019, Fanning offered Weiher a 9:30 a.m. start time during an informal one-on-one meeting. (Doc. # 27-1 at 138:10-21; Doc. # 27-30 at ¶ 6). The parties dispute whether Fanning told Weiher at this time that the accommodation was temporary or that she needed to immediately contact Human Resources (HR) to get the accommodation request formally approved. (Doc. # 27-1 at 137:24-139:7; Doc. # 27-30 at ¶ 6). Although Fanning knew that Weiher wanted the later start time

for medical reasons, he did not know the specific medical reasons. (Doc. # 27-1 at 141:8-13, 142:25-143:9; Doc. # 30-7 at 29).

In August 2019, Fanning and Weiher had a meeting with Lincare IT managers to discuss the IT Master. (Doc. # 27-30 at ¶ 8). Fanning stated that, during that meeting, Weiher "became upset . . . and started shouting loudly at the IT executives and aggressively pushed a stack of papers across the table at them." (Id.). Fanning ended the meeting early and immediately counseled Weiher about her behavior. (Id.). According to Fanning, Weiher was unreceptive to his feedback and argued with him. (Id.). Another Lincare employee testified that the August 2019 meeting "was very loud and they were yelling at one another." (Doc. # 27-27 at 8-9). Afterwards, Weiher was upset and crying. (Id.).

On August 23, 2019, Fanning contacted HR about Weiher, writing: "Have some negative feedback likely from [IT managers] following an IT catch up we had last week. Dawn and I had a very candid discussion after that meeting where I informed her that she cannot behave that way (let alone in front of senior leaders) and be aggressive and literally thrust paperwork in the face of [an IT manager]/anyone. I don't plan on giving her a warning. . . . [During their next

one-on-one meeting] I will let her know that if she cannot get here regularly by 09:30 she will be written up." (Doc. # 27-30, Exh. 1 at 2). On August 30, 2019, the HR manager assigned the complaint closed the ticket, writing:

> Spoke at length with Doran Fanning regarding Dawn Weiher. Since meeting with Dawn to discuss recent concerns, he has seen positive improvement. He has been coaching her and discussing her arrival time, and both have shown improvement. Her performance (quality and quantity) are both very solid. She has a complex role and there are a number of new players he believes contributes to some confusion/frustrations. He wants to be fair with Dawn and will continue to coach her. I did confirm that she has not reached out to Benefits to discuss any request for accommodation, though being notified of that resource.

(Doc. # 27-30, Exh. 1 at 1).

On August 26, 2019, as part of an email exchange between Fanning and Lincare executive Greg McCarthy, Fanning reported that Weiher "has been frustrated and a little overwhelmed," but that he was planning on taking away her responsibility over the indirects category and having her focus on IT. (Doc. # 30-10 at 3). Fanning also wrote that Weiher was struggling with "some attendance issues that [had] come to light," as well as "her recent behavior in a meeting with IT leadership . . . that she was coached by me on immediately afterwards." (Id.). When McCarthy asked what was overwhelming Weiher, Fanning replied: "Workload and she hates to ask for help. So

6

it's a false negative. Told her that asking for help is not a weakness. She has a great eye for detail and good at digging into systems and finding data. She needs to work on her defensive attitude . . . it comes over aggressive sometimes and as if 'she isn't good enough.' [Takes] it a little too personal." (Id. at 2). McCarthy replied: "Looks like she doesn't have a track record of showing up to work on time (70%) of the time? Why are we allowing her to start at 9:45 – 10 am every day?" (Id. at 1). Fanning replied, "Agreed with [Gyanesh Ratna, Fanning's supervisor] to allow her to start 09:30 and work later. She has had some health issues. Am speaking to her about the time issue tomorrow as it seems it got worse after we allowed later start time. If it doesn't revert back to on time it will be a written warning." McCarthy then asked, "Is it the health issue that keeps her from starting at 8 am?" Fanning replied, "Believe it is a contributory factor but will clarify tomorrow." (Id.).

McCarthy then reached out to Ratna, stating that he was concerned about employee punctuality. (Doc. # 30-20 at 16:18-17:15). On August 27, 2019, Ratna sent an email to the entire Procurement Department stating that 9:00 a.m. to 4:30 p.m. are the "designated core working hours for headquarters and everyone needs to follow without exception." (Doc. # 27-25;

Doc. # 27-1 at 144). Fanning forwarded that email to Weiher later the same day, writing "if there is anything that impacts your ability to be here by 9 am, please speak to Stephanie Varao/HR Support." (Doc. # 27-30, Exh. 3). Three minutes after forwarding that email to Weiher, Fanning emailed Paula Adams, Lincare's head of employee relations and HR services, and wrote: "Greg spoke to [Ratna] yesterday after my email trail. [Ratna] came to see me earlier today and then sent the email below." (Id.).

Weiher was tardy to work every day during the week of September 9-13, 2019. (Doc. # 27-30 at ¶ 11). On September 19, 2019, Fanning gave Weiher a verbal warning for tardiness. (Id.; Doc. # 27-30, Exh. 4; Doc. # 30-17). According to a contemporaneous email from Fanning to HR employees, Weiher "was not happy and pointed to the fact that sometimes she has to park far away to get into the office as well as she has arthritis." (Doc. # 30-17 at 2). According to Fanning, he believed the verbal exception he had granted in July 2019 had been "retracted" due to Ratna's August 27, 2019, email, and he advised Weiher to contact HR if she needed a later start time due to health reasons.[3] (Doc. # 27-30 at ¶ 11).

_____

[3] According to Weiher, it was after Ratna "revoked" her prior verbal accommodation in the August 27 email that Fanning first

On September 19, 2019, Weiher emailed Stephanie Varao, the head of benefits for Lincare, to initiate a formal request for accommodation. (Doc. # 27-5). On September 24, 2019, Weiher filled out Lincare's formal accommodation request, listing her disabilities as "primary focal hyperhidrosis, diabetes with neuropathy, rheumatoid arthritis, and high blood pressure." (Doc. # 27-6). The form submitted by Weiher's medical care provider stated that Weiher "has issues in the morning due to pain and issues with uncontrollable sweating which may affect her ability to report to work exactly at 9 am" and that "stress irritates her medical conditions." (Doc. # 30-5 at 34). The accommodation she requested was being able to start work between 9:00 and 9:30 a.m. (Id.). On September 27, 2019, Lincare granted Weiher's reasonable-accommodation request under the ADA, granting her a modified start time of between 9:00 and 9:30 a.m., so long as she continued to work a full workday. (Doc. # 27-7). This accommodation remained in place for the remainder of Weiher's employment. (Doc. # 27-1 at 158:10-20).

On that same day, September 27, 2019, Fanning sought to give Weiher a written warning for performance issues,

---

told her she needed to seek a formal accommodation from HR. (Doc. # 30-11; Doc. # 27-1 at 141-42, 144).

including insubordination, a lack of urgency in her responsiveness to emails, IT Master errors, and tardiness. (Doc. # 27-30 at 26-27 (Exh. 5)). According to Weiher, Fanning had never previously issued her a verbal warning for performance issues. (Doc. # 30-7 at 40:10-41:18).

According to Lincare, Fanning sent this email at 2:06 p.m. on September 27, before he had any knowledge that Weiher had requested or received her formal accommodation from HR. (Doc. # 27-30 at ¶ 12). Later that day, at 5:19 p.m., HR notified Fanning that Lincare had approved the formal accommodation. (Id.). Two days later, on September 29, Fanning emailed HR, stating that: "In light of receiving from Stephanie (work accommodation) am prepared to rescind this request for a period of 2 weeks. This is conditional upon there being a perfect attendance record per the Accommodation given herein and/or improvements to the points detailed herein." (Id. at 26).

On October 1, 2019, Shiraz Mohammed, Lincare's head of HR, forwarded to McCarthy the email chain regarding Fanning's request for a written warning and subsequent retraction. (Doc. # 30-22 at 3:10-11; Doc. # 30-23). Mohammed wrote that Lincare did grant her request "based on her doctor's note

under the ADA rules." (Doc. # 30-23). McCarthy responded, "Do we know the nature of the request from her doctor?" (Id.).

By October 22, 2019, Fanning had knowledge that Weiher had monthly doctor's appointments. (Doc. # 30-7 at 42:24-43:16; Doc. # 30-13).

Weiher admits that throughout September and October 2019, she continued to struggle to complete her job duties and be responsive. (Doc. # 26 at ¶ 15; Doc. # 30 at ¶ 15). For example, there is evidence that Weiher's untimely responses served to delay a project for multiple months, and eventually Fanning took control of the project in September 2019 in order to complete it. (Doc. # 27-30 at ¶ 13(b); Doc. # 27-30, Exh. 8). As part of that email chain, Weiher acknowledged that "I have been struggling to get my tasks completed." (Doc. # 27-30 at 36 (Exh. 8)). On October 23, 2019, Fanning took away Weiher's responsibilities for the indirects category, in order to have her focus on IT work and to lighten her workload. (Doc. # 27-30 at ¶ 14; Doc. # 27-30, Exh. 10).

On November 5, 2019, Fanning sent an email to Ratna and HR stating that Weiher's performance had not improved even after he removed part of her workload and that she continued to be unresponsive, insubordinate, and failed to complete her

11

job duties. (Doc. # 26 at ¶ 17; Doc. # 30 at ¶ 17; Doc. # 27-30, Exh. 5). As of November 5, it was Fanning's intention to fire Weiher later that week. (Doc. # 27-30, Exh. 5).

Fanning then discussed his intention with Ratna and Mohammed. After getting input from HR that the better practice was to first issue Weiher a written warning, Fanning decided to give Weiher a final written warning. (Doc. # 27-30 at ¶ 15; Doc. # 30-29 at ¶ 7; Doc. # 30-22 at 11-12).

Meanwhile, on November 13, 2019, Fanning sent Weiher an email telling Weiher that, in earlier emails with a client, she had, in essence, told the client that Lincare had delayed. (Doc. # 27-10 at 2). After Weiher responded, Fanning wrote back:

> My request of you is to be mindful of how those comments could be misconstrued. Jeff does not need to receive an email that clearly says Procurement internal systems caused a delay.
>
> Did Jeff ask why there was a delay? Did Jeff request a full and detailed explanation? Could you have handled this differently? I need you to focus on the multitude of projects clearly detailed in the IT master (that I created) and to respond more urgently when I ask you simple questions to quantity and show me savings[.] This is a coaching moment for you.

(Id. at 1). Weiher then forwarded that email to Ratna, saying that Fanning's attitude toward her had turned "very hostile and it is making me uncomfortable." (Id.). And on November

12

18, 2019, Weiher emailed Fanning, cc'ing Ratna, where she wrote:

> I do not understand why your demeanor and tone has turned hostile towards me but it is an uncomfortable feeling and to date you have not given me any reason to believe that my work or productivity has declined. You are duplicating my work, seeking out meetings with my vendors without any notification or invitation to me and your emails have made me feel like I am not even allowed to work directly with my IT counterparts. I don't know what it is that you are upset with me about but I would like to know so we can work through it. I am copying Gyanesh on this email because I have spoken to him as well because I do not know what has changed so drastically.

(Doc. # 27-30 at 30 (Exh. 9)). In his declaration, Fanning stated that he found this response "insubordinate and disrespectful" for "questioning his leadership and directives." (Doc. # 27-30 at ¶ 13).

On November 20, 2019, Fanning issued a final written warning (the "FWW") to Weiher. (Doc. # 27-8). The FWW lodged the following infractions against Weiher:

- "You do not demonstrate a sense of urgency responding to requests from the field."

- "Ongoing lack of respect / insubordinate actions / behavior toward me as your manager."

- "You respond defensively when I attempt to provide you with constructive feedback[.]"

13

- "You have not assumed full responsibility for the IT Master."

- A lack of progress on changing a shredding vendor, which project was completed only after Fanning undertook it.

- An Indirects project was withdrawn from Weiher after "little to no progress had been made."

(Id.). The FWW warned that Weiher must demonstrate "immediate and sustained improvement" in the areas noted therein or else she may face further corrective action, including termination. (Id. at 1-2).

The next day, Weiher filed a two-page written dispute of the FWW with HR. (Doc. # 27-9). The last sentence of the dispute states: "I hate to point out that the timeline and examples that Doran has referenced are after my accommodation was approved by HR." (Id.). Mohammed, as the head of HR, testified that he conducted an investigation after the dispute and spoke to Fanning, Ratna, and Adams. (Doc. # 30-22 at 4-6). He ultimately concluded that the FWW should stand. (Doc. # 27-29 at ¶ 8). However, Fanning testified that he never spoke to Mohammed or anyone at HR about the written dispute and that he was never provided a copy of the dispute until the day before his deposition. (Doc. # 30-7 at 50-52).

14

Ratna also testified that he was never provided a copy of the dispute. (Doc. # 30-20 at 27:6-12). Weiher takes exception to the fact that she was never informed of the result of her written dispute. (Doc. # 27-1 at 122).

According to Weiher, after the FWW was issued, Fanning began withdrawing IT savings projects from her, giving them to newly hired employees instead. (Doc. # 27-1 at 130, 114-15).

According to Fanning, Weiher's performance "improved slightly for a couple of months after the [FWW]. However, in March/April 2020[4], the same performance issues started reoccurring, including a lack of responsiveness and failure to complete her job duties," such as the IT Master, and the "IT executives were frustrated with her performance issues." (Doc. # 27-30 at ¶ 17). For example, in March 2020, Weiher failed to respond to three email requests regarding the pick-up of an old copier. (Doc. # 27-23). Weiher testified that she was receiving similar requests from 800 centers; she was "overwhelmed" and "bombarded" and did not respond because "it was not on the priority list at that time." (Doc. # 27-1 at

---

[4] In March 2020, Lincare switched eligible employees, including Weiher, to fully remote work due to the COVID-19 pandemic. (Doc. # 26 at ¶ 22; Doc. # 30 at ¶ 22).

246-47). She testified that, "I made it very clear to everyone that things were slipping through the cracks because I had too much. One person cannot handle 800 locations across the U.S., as well as a very impatient IT department in Clearwater." (Id. at 247:14-19).

According to Weiher, Fanning did not communicate any dissatisfaction with her performance until late April 2020. (Doc. # 30-7 at 49:14-19).[5]

On April 24, 2020, Fanning sought permission to terminate Weiher's employment and hire another person. (Doc. # 30-15). In that email to HR, Fanning stated that Weiher exhibited a lack of urgency in responding to colleague requests, was "unable" to perform her job duties, failed to support the procurement team, and incorrectly reported savings. (Doc. # 27-30 at ¶ 18).

On May 21, 2020, Fanning followed up on his request to terminate Weiher's employment. (Doc. # 26 at ¶ 25; Doc. # 30 at ¶ 25). Both of these communications stated that additional performance errors had occurred. (Doc. # 27-30, Exhs. 12, 13). HR employee Adams testified that she inadvertently

---

[5] Fanning testified that he did not give her any written direct communications about her performance, although there was "e-mail traffic where I'm asking about specific projects." (Doc. # 30-7 at 49:14-19).

16

failed to timely respond to Fanning's April and May communications. (Doc. # 27-29 at ¶ 10).

Weiher points out that on May 19, 2020, she asked Fanning for leave to attend a doctor's appointment on May 22. (Doc. # 30-14). Just two days after approving the leave, Fanning emailed Ratna, stating that he wanted May 29, 2020 to be Weiher's last day of employment. (Doc. # 30-15).

On July 16, 2020, Fanning again followed up about his request to terminate Weiher and Adams agreed to draft the termination letter. (Doc. # 27-29 at ¶ 10; Doc. # 30-15). In his July 16 email, Fanning wrote:

> There has been another case where Dawn has failed to implement a solution that was listed since September 2019 in our list of services to deliver that (this week) I have had to personally deal with. After this came to light she stated she wasn't well and needed rest of week off as she has to go see a Doctor.
>
> Resultantly I will terminate her employment Tuesday next week over the phone. She remains unable to deliver against pre-planned projects[.]

(Doc. # 30-15 at 2).

On July 20, 2020, Weiher asked Fanning for time off to see a gastrointestinal surgeon.[6] (Doc. # 27-1 at 86, 89-90).

---

[6] Weiher was diagnosed with Irritable Bowel Syndrome after leaving Lincare, although she testified that she experienced "bathroom issues" while working there. (Doc. # 27-1 at 87, 89, 260).

On July 21, 2020, Weiher's employment with Lincare was terminated. (Doc. # 26 at ¶ 26; Doc. # 30 at ¶ 26). Fanning terminated her employment over the phone. (Doc. # 27-1 at 86, 89).

On July 25, 2020 – four days after the termination – Weiher sent a text message to her "very good friend" and former co-worker, Nikki Tipton, stating:

> Doran screwed me by stating I was terminated due to poor job performance. . . . All of this is because Doran has been butt hurt since that meeting in August last year when he threw me under the bus in the meeting with Bruce V, Rob, and Bruce R . . . I don't think Doran or Gyanesh realize how much backup I have about how I was a rock star right up until that meeting in August [that] ended with him and I arguing in my office.

(Doc. # 27-27 at 25:23-26:12; Doc. # 27-28).

Weiher initiated this action against Lincare on November 3, 2020, asserting claims for disability discrimination under the Americans with Disabilities Act (ADA) (Count I) and retaliation in violation of the ADA (Count II). (Doc. # 1). Lincare filed its answer on November 25, 2020. (Doc. # 9). The case then proceeded through discovery.

Lincare now moves for summary judgment on all claims. (Doc. # 26). The Motion has been fully briefed (Doc. ## 30, 31) and is ripe for review.

II.  **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)(citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the

19

pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995)(quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

## III. **Analysis**

Lincare seeks summary judgment on both of Weiher's ADA claims. (Doc. # 26). The Court will address each in turn.

A.    **Disability Discrimination Claim**

Weiher brings Count I for disability discrimination under the ADA.

The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Where, as here, a plaintiff attempts to prove an employer's intentional discrimination through circumstantial evidence, the familiar burden-shifting framework laid out in McDonnell-Douglas[7] applies. Holly v. Clairson Indus., LLC, 492 F.3d 1247, 1255 (11th Cir. 2007) (explaining that the "burden-shifting analysis of Title VII employment discrimination claims is applicable to ADA claims").

    1.   McDonnell-Douglas

In order to establish a prima facie case of discrimination under the ADA, a plaintiff must show that she (1) is disabled, (2) is a qualified individual, and (3) was discriminated against because of her disability. Lewis v. City of Union City, 934 F.3d 1169, 1179 (11th Cir. 2019). Once the plaintiff makes this showing, the defendant has the

_____

[7] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

burden of articulating a legitimate, non-discriminatory reason for its employment action. Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001). If the defendant meets this burden, then the inference of discrimination is rebutted, and the inquiry proceeds to a new level of specificity in which the plaintiff must show that the proffered reason is merely a pretext for unlawful discrimination. Brooks v. County Comm'n of Jefferson Cnty., 446 F.3d 1160, 1162 (11th Cir. 2006).

First, Lincare argues that Weiher cannot establish a prima facie case of disability discrimination because she cannot demonstrate that she is disabled or that she was discriminated against because of her purported disability. (Doc. # 26 at 13-16). The Court need not address this issue. For the purposes of this Order, the Court will assume, without deciding, that Weiher has shown a prima facie case because it concludes that she failed to create a genuine issue of material fact that Lincare's reasons for firing her were pretextual.

With this assumption in place, the burden shifts to Lincare to articulate a legitimate, non-discriminatory reason for Weiher's firing. This Lincare has easily done. They have presented evidence that Weiher was struggling to complete her

job duties, was unresponsive to emails, and was insubordinate or aggressive to colleagues. See Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 1999) (citing poor performance and yelling vulgarities as legitimate, non-discriminatory reasons for termination). The burden now shifts back to Weiher to establish that Lincare's proffered reasons are pretext for disability discrimination.

"[T]o avoid summary judgment [the plaintiff] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1228 (11th Cir. 1993) (citation omitted). "A legitimate nondiscriminatory reason proffered by the employer is not a pretext for prohibited conduct unless it is shown that the reason was false and that the real reason was impermissible retaliation or discrimination." Worley v. City of Lilburn, 408 F. App'x 248, 251 (11th Cir. 2011)(citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)). "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot merely recast the reason, but must meet it 'head on and rebut it.'" Id. (quoting Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000)). Thus, to show pretext, an employee must demonstrate "such weaknesses,

23

implausibilities, incoherencies, or contradictions in the
employer's proffered legitimate reasons for its action that
a reasonable factfinder could find them unworthy of
credence." McCann v. Tillman, 526 F.3d 1370, 1375 (11th Cir.
2008)(quoting Cooper v. S. Co., 390 F.3d 695, 725 (11th Cir.
2004)). The Court cannot second guess the defendant's
business judgment or inquire as to whether its decision was
"prudent or fair." Damon, 196 F.3d at 1361.

Here, the Court agrees with Lincare that Weiher bases
her claim on temporal proximity, her disagreement with the
stated reason for termination, and speculation. But this is
insufficient to create a jury question on the issue of pretext
because Weiher has not rebutted Lincare's proffered reason
head on.

As an initial matter, Weiher cannot survive summary
judgment simply by quibbling with whether her performance was
poor enough to merit termination or by relying on her own
speculation as to the true cause of her termination or the
breakdown of her working relationship with Fanning. See
Chapman, 229 F.3d at 1030 (explaining that a plaintiff cannot
show pretext "simply by quarreling with the wisdom of" the
employer's proffered non-discriminatory reason); Aldabblan v.
Festive Pizza, Ltd., 380 F. Supp. 2d 1345, 1353 (S.D. Fla.

2005) ("Plaintiff's mere belief, speculation, or conclusory allegations that Defendant discriminated against [her], therefore, are insufficient to withstand summary judgment.").

There are, however, several points where there is close temporal proximity between one of Weiher's actions and one of Lincare's actions. First, the Court notes that Lincare granted Weiher's formal accommodation request on the same day that Fanning requested a written warning against Weiher. Second, there was a span of 39 days between the grant of her formal accommodation request and Fanning's first attempt to terminate her employment. Third, there was a gap of approximately two weeks between when Fanning knew that Weiher had monthly doctors' appointments and his first attempt to terminate her employment in November 2019. Finally, the Court notes that there are two instances in the record – in May 2020 and July 2020 – in which Weiher requested time off for medical care and Fanning sent communications seeking to terminate her.

Close temporal proximity is, standing alone, generally insufficient to establish pretext. Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1298 (11th Cir. 2006) ("The close temporal proximity between Hurlbert's request for leave and his termination — no more than two weeks, under the

broadest reading of the facts — is evidence of pretext, though probably insufficient to establish pretext by itself."); see also Johnson v. Miami-Dade Cty., 948 F.3d 1318, 1328 (11th Cir. 2020) (explaining that temporal proximity of less than two months was insufficient by itself to establish pretext). The relevant question is whether Weiher has presented "other evidence supporting [her] claim that [Lincare's] stated reason for terminating [her] was pretextual." Daugherty v. Mikart, Inc., 205 F. App'x 826, 828 (11th Cir. 2006).

For example, this Court has considered a case where a plaintiff pointed to a two-week separation between the plaintiff's request for time off due to knee surgery and his termination as evidence of pretext. Marx v. Baker Cnty. Med. Servs., Inc., No. 3:16-cv-462-TJC-MCR, 2018 WL 4215950, at *8 (M.D. Fla. Sept. 5, 2018). The evidence in Marx showed that, in between the time the employee requested leave and his termination date, his supervisor voiced his disapproval regarding the plaintiff's work performance, noted that the plaintiff was "disruptive and negative" at training, had failed to direct his staff on how to proceed with a task, failed to take responsibility for a certain task, and showed no signs of improvement. Id. at *9.

In granting summary judgment to the employer and finding that the plaintiff had not established a genuine issue of material fact as to pretext, that court wrote:

> Other than the temporal proximity between their meeting in which he requested leave and his termination — insufficient on its own to show pretext — Marx has simply not presented a genuine issue of material fact that Markos fired him for any reason other than Marx's subpar performance in attempting to lead the respiratory department through the Meditech conversion. In the Eleventh Circuit, the court does not "sit as a 'super-personnel department,' and it is not [the court's] role to second-guess the wisdom of an employer's business decisions — indeed the wisdom of them is irrelevant — as long as those decisions were not made with a discriminatory motive."

Id. at *10 (citations omitted).[8]

Here, similarly, the temporal proximity between Weiher's request for an accommodation, the granting of that request, and/or her requests for medical leave and Lincare's disciplinary actions and efforts to terminate her is not sufficient, standing alone, to establish pretext on her retaliation claim.

It is insufficient because Weiher has not rebutted Lincare's reason head on – she has not shown that Lincare's proffered reason for her termination was false or that the

---

[8] While Marx involved a retaliation claim under the FMLA, not the ADA, the Court nevertheless finds its reasoning to be persuasive.

true reason was discriminatory, and she has not demonstrated such "weaknesses, implausibilities, incoherencies, or contradictions in [Lincare's] proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." See McCann, 526 F.3d at 1375; Pitts v. Hous. Auth. for City of Huntsville, 262 F. App'x 953, 956 (11th Cir. 2008) (upholding summary judgment for employer where "none of the various reasons identified by Pitts as establishing pretext dispute, 'head on,' the [defendant's] reason for terminating him"); Crawford v. City of Fairburn, Ga., 482 F.3d 1305, 1309 (11th Cir. 2007) ("[Plaintiff] erroneously argues that evidence of a discriminatory animus allows [her] to establish pretext without rebutting each of the proffered reasons of the employer.").

Lincare has submitted voluminous evidence that for many months before her July 2020 termination, Weiher struggled with poor work performance. These allegations about Weiher's performance issues are essentially unrebutted and, indeed, Weiher freely admitted in her deposition that she was overwhelmed with work and things would slip through the cracks.

In light of these performance issues, the temporal-proximity evidence and speculation offered by Weiher in

support of her disability discrimination claim are insufficient to raise a genuine issue of material fact as to whether Lincare's stated reason for her termination was pretextual. See Jenks v. Naples Cmty. Hosp., Inc., 829 F. Supp. 2d 1235, 1251-52 (M.D. Fla. 2011) (granting summary judgment for employer on plaintiff's ADA claim where employee had documented poor work performance for several months prior to her termination, was given warnings that her performance needed to improve, and plaintiff failed to show that her employer's legitimate reasons were a pretext for disability discrimination).

In her response, Weiher points to Lincare's alleged failure to follow its own internal procedures with respect to her dispute of the FWW as evidence of pretext, writing that Mohammed, as the head of HR, "ignored" her written dispute. (Doc. # 30 at 20). It is true that the evidence is disputed as to what steps Mohammed took as part of his investigation of Weiher's FWW dispute. However, even if Mohammed failed to precisely follow company procedure during his investigation, "[a] deviation from company policy does not demonstrate discriminatory animus." Mitchell v. USBI Co., 186 F.3d 1352, 1356 (11th Cir. 1999). Instead, a plaintiff must show that there was a nexus between the deviation and the employee's

protected status or conduct. <u>Berg v. Fla. Dep't of Lab. & Empl. Sec., Div. of Vocational Rehab.</u>, 163 F.3d 1251, 1255 (11th Cir. 1998). Weiher has not met her burden of showing such a nexus and, therefore, the alleged deviation from policy does not indicate pretext. <u>See</u> <u>Hutchinson v. Sec'y, Dep't of Veteran Affairs Agency</u>, No. 6:16-cv-360-JA-KRS, 2018 WL 369155, at *9 (M.D. Fla. Jan. 10, 2018) (holding that agency's procedural violations "do not tend to show that the VA was motivated by discriminatory animus because Hutchinson has failed to present evidence that discrimination played a role in any procedural irregularities" and therefore finding no triable issue as to pretext).

### 2.   <u>Convincing mosaic</u>

In her response, Weiher argues that she has presented a convincing mosaic of evidence that creates a triable issue as to whether Lincare had an unlawful reason for her termination. (Doc. # 30 at 16-17). As the Eleventh Circuit has explained, "establishing the elements of the <u>McDonnell Douglas</u> framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." <u>Smith v. Lockheed-Martin Corp.</u>, 644 F.3d 1321, 1328 (11th Cir. 2011). Rather, "a plaintiff will always survive summary judgment if he presents

circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." Id.

A plaintiff can still proceed past summary judgment if she "presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision maker." Id. "A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) systematically better treatment of similarly situated employees, and (3) pretext." Holley v. Ga. Dep't of Corr., 845 F. App'x 886, 890-91 (11th Cir. 2021).

Weiher has not cleared that hurdle here, for the reasons stated above. While the Court does note some instances of "suspicious timing," as noted above, and certain "ambiguous statements" from Lincare executive McCarthy inquiring about Weiher's health vis-à-vis her tardiness and eventual accommodation request, these remarks were not related to any employment decision, nor is there any evidence that McCarthy ever sought or solicited Weiher's termination. See Rojas v. Florida, 285 F.3d 1339, 1343 (11th Cir. 2002) (stating that although stray remarks that are not directly related to an employment decision may contribute to a circumstantial

showing of discriminatory intent, they must be read in conjunction with the entire record and considered with other evidence).

The undisputed evidence shows that Fanning at first granted Weiher an informal accommodation to start later in the morning, and then encouraged her to get a formal accommodation from HR. He approved nearly every time-off request she made, for medical reasons and otherwise, and worked with her for many months after the issuance of the FWW to see if her performance would improve, which ultimately it did not. Weiher has also failed to show a convincing mosaic of circumstantial evidence sufficient to survive summary judgment. See Davidson v. Chspsc LLC, No. 20-14201, 2021 WL 2550400, at *6 (11th Cir. June 22, 2021) ("Her 'convincing mosaic' arguments, however, are the same as her pretext arguments, and they similarly fail to provide sufficient circumstantial evidence of discrimination or retaliation under the ADA."); see also Reyes v. Fed. Express Corp., No. 6:20-CV-278-WWB-EJK, 2021 WL 2895645, at *3-4 (M.D. Fla. July 9, 2021) (rejecting plaintiff's convincing-mosaic theory where evidence showed that plaintiff falsified his time card, lied during an investigation, and was flouting other company policies).

For the reasons explained above, even drawing all reasonable inferences in Weiher's favor, no reasonable jury could conclude that Lincare's reasons for firing her were pretextual.

Defendant is entitled to summary judgment on Count I.

**B.   Retaliation Claim**

In Count II, Weiher asserts a claim for retaliation under the ADA.

The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA]." 42 U.S.C. § 12203(a). To establish a prima facie case of ADA retaliation, a plaintiff must show: (1) that she engaged in statutorily protected activity; (2) that she suffered an adverse employment action; and (3) a causal link between the protected activity and the adverse action. Bothwell v. RMC Ewell, Inc., 278 F. App'x 948, 952 (11th Cir. 2008).

If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged action. EEOC v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1272 (11th Cir. 2002). Where the employer meets its burden, the

33

plaintiff "must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination" to avoid summary judgment. Brooks, 446 F.3d at 1163.

Once again, the Court will assume *arguendo* that Weiher has demonstrated a prima facie case of ADA retaliation. As explained above, Lincare has shown a legitimate and non-discriminatory reason for her termination.[9] And, for the reasons described above, Weiher has failed to meet her burden of demonstrating a genuine issue of material fact as to whether Lincare's stated reason was pretextual.[10] Therefore, the Motion is granted as to Count II.

---

[9] In her Complaint, Weiher identified the "adverse employment action" as her termination and did not identify any other disciplinary action as the basis for her retaliation claim. See (Doc. # 1 at ¶ 32).

[10] It is not clear whether the convincing-mosaic theory applies to retaliation claims. See Change v. Midtown Neurology, P.C., No. 1:19-cv-00885, 2021 WL 2483368, at *25 (N.D. Ga. Feb. 3, 2021) (noting that "[t]he Eleventh Circuit has yet to decide in a published decision whether retaliation claims can survive summary judgment under a convincing-mosaic theory" and collecting cases). But even assuming it does, Weiher does not raise such an argument with respect to her retaliation claim. Therefore, the Court only considers her discrimination claim under this theory.

Accordingly, it is

**ORDERED**, **ADJUDGED**, and **DECREED**:

(1)   Defendant Lincare Procurement, Inc.'s Motion for Summary Judgment (Doc. # 26) is **GRANTED.**

(2)   The Clerk shall enter judgment in favor of Defendant Lincare Procurement, Inc. and against Plaintiff Dawn Weiher.

(3)   Once judgment has been entered, the Clerk shall terminate all deadlines and pending motions, and close this case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 27th day of October, 2021.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE